UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JON GILES ) | |
|    Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 15-2068 |
| ) | |
| CHAD KOLITWENZEW, et.al., ) | |
|    Defendants. ) | |

## SUMMARY JUDGMENT ORDER

This cause is before the Court for consideration of the Defendants' motion for summary judgment.[32]

I.  BACKGROUND

The Plaintiff, a *pro se* prisoner, alleges Defendants Chad Kolitwenzew, Gabrielle Tobek, Nicholas Mayo, Matthew Meehan and Robert Schultz violated his constitutional rights at the Jerome Combs Detention Center (JCDC) when they failed to protect him from an inmate attack.  Specifically, Plaintiff claims Defendants Kolitwenzew and Schultz made the decision to move a mentally unstable inmate with a history of violent attacks into a less secure area of the jail where Plaintiff was housed.  On October 9, 2014, the inmate hid in the jail shower area and then attacked Plaintiff's cell mate.  Plaintiff says when he attempted to help his cell mate, the inmate began attacking him as Defendants Mayo, Meehan and Tobek stood by and did nothing.  When officers did intervene, Plaintiff claims he complied with commands to lie down, but the inmate jumped on him and continued to assault him.  Plaintiff claimed he was taken to the hospital and still suffers with his injuries.

1

The Court found Plaintiff had stated a claim against each of the named Defendants in their individual capacities, and an official capacity claim against Defendant Kolitwenzew. *See* July 21, 2015 Merit Review Order. Plaintiff claimed the "policy and custom of placing convicted inmates and federal inmates in the same cell housing unit as state pretrial inmates or known previously identified violent inmates" led to the violation of his constitutional rights. (Amd. Comp., p. 6-7).

II. FACTS

Defendant Chad Kolitwenzew was the JCDC Chief of Operations and Defendant Robert Schultz was his assistant. Defendants Gabrielle Tobeck, Matthew Meehan and Nicholas Mayor were correctional officers at the facility. Defendant Chief Kolitwenzew was responsible for the day-to-day operations at both JCDC and the Kankakee County Correctional Center including overseeing administration, security, budget and supervising staff and inmates. (Def. Mot., Kol. Aff., p. 1).

Pursuant to Illinois County Jail Standards, JCDC does not house convicted offenders in the same unit with pretrial detainees. (Def. Mot., Kol. Aff., p. 1). Inmate Giles entered JCDC in March of 2014 as a federal pretrial detainee. Jail administrators claim they were not aware Plaintiff was already a convicted offender serving his sentence when he was indicted on the new offense. (Def. Mot., Kol. Aff., p. 1; Plain. Depo., p. 14-17). Therefore, Plaintiff was housed as if he were only a pretrial detainee.

During the relevant time period, Plaintiff was housed in E-POD with another pretrial detainee. Plaintiff says he and his cell mate got along and Plaintiff had no altercations with other E-POD inmates prior to October of 2014.

On October 8, 2014, Inmate K.M. was also housed in E-POD, but he was confined to a single-man, segregation cell on the lower level. (Def. Mot., Kol. Aff., p. 2).

> E-POD has been used as a segregation unit for inmates with a history of assaultive behavior or other violent behavior. E-POD has also been used as a segregation unit for inmates placed on suicide watch. Inmate (K.M.) was housed in a cell by himself in the dayroom because of his history of being involved in altercations with other inmates and staff.
> (Def. Mot., Kol. Aff., p. 2).

Defendant Chief Kolitwenzew says neither he nor the Assistant Chief made the decision to transfer Inmate K.M. to this cell. The Defendant claims the decision was made by "classification department." (Def. Mot., Kol. Aff., p. 1). Nonetheless, Defendant Kolitwenzew says Inmate K.M. was transferred not only because of his violent history, but also because he "had been placed on suicide watch and the officers' desk within E-POD is inside the cell block making it easier to view and maintain a constant visual of (the inmate)." (Def. Mot., Kol. Aff., p. 2). Due to his status, Inmate K.M. was confined to his cell and allowed only one hour in the day room or shower area when no other inmates were present. (Def. Mot., Tob. Int. # 5; Tob. Req. Admit #2; Kol. Req. Admit #2).

Prior to October 8, 2014, Plaintiff admits Inmate K. M had never threatened him, nor had he even had a conversation with the inmate. (Def. Mot., Plain. Depo. p. 42 -45). Consequently, Plaintiff had never informed any jail staff member he was in danger or

3

needed to be moved away from Inmate K.M. (Def. Mot., Plain. Depo., p. 42-45).  In addition, Plaintiff had never heard a conversation or argument between his cell mate and Inmate K.M. (Def. Mot., Plain. Depo. p. 94-95).

Defendant Chief Kolitwenzew says how staff responds to an inmate altercation depends on the circumstances of the particular incident.  "[H]owever, a '10/10' is immediately called over the radio signaling a fight in progress and back-up officers are called to respond to the altercation." (Def. Mot., Kol. Aff., p. 2).

> It is JCDC polity that if there is an inmate altercation, correctional officers must wait for back-up officers to outnumber the inmates involved in the altercation before using physical tactics to interject themselves into the altercation, and preferable must wait for a taser if one is available in order to protect the officers, inmates and the institution.  Officers are trained to provide verbal commands before attempting to physically restrain inmates involved in an altercation. (Def.Mot., Kol. Aff., p. 2-3).

Neither Defendant Kolitwenzew, nor Defendant Schutlz was present during the altercation involving Plaintiff.

On October 8, 2014, Defendant Tobek performed a headcount of E-POD inmates at the start of her shift.  While the Defendants do not directly address how head counts are performed, the attachments to their dispositive motion provide some explanation.

JCDC correctional officers count inmates within a POD at the beginning, middle and end of every shift. (Def. Mot., Tob. Int. # 3).  The JCDC written policy and procedure manual states when headcount is performed, the housing unit officer will instruct all inmates to stand by their doors or bunks and wait for count to finish.  The officer will then visually check to insure each person is in their cell. (Def. Mot., Kol. Req. Admit # 6).

However, the daily practice of performing headcounts is different. For instance, Defendant Assistant Chief Schultz says officers count the both inmates in the unit, and those outside the unit "for medical, attorney-visits and other reasons." (Def. Mot., Sch. Int. # 20). In addition, Defendant Schultz says since Inmate K.M. was only allowed one hour out of his cell by himself, he was at times counted as present while he was in the dayroom instead of his cell. (Def. Mot., Sch. Int. # 1)

On October 8, 2014, at the start of her shift, Defendant Tobeck counted 32 inmates in the POD and three inmates out of the POD. (Def. Mot., Tob. Int. # 7).

> Pursuant to custom, I count all of the inmates that are within the POD in my headcount. (Inmate K.M.) was appropriately counted as being within the POD in the dayroom when I conducted the count after coming on duty on October 8, 2014. (Def. Mot., Tob. Int. #5).

The other inmates who were in E-POD at the time were still within their cells during the count.

The security video of E-POD on October 8, 2014 starts at approximately 3:15. (Def. Mot., Ex. J).[1] The view from the stationary camera shows the dayroom area with several anchored tables and chairs in the center. On the left are a few cell doors, and on the right is a large desk or control center. In the back on the room, there is a staircase

---

[1] "[W]hen a court analyzes a summary judgment motion, the court can and should accept as true the facts depicted by unchallenged video recordings where a reasonable jury could not reject that evidence." *Marion v. City of Corydon, Ind.*, 2008 WL 763211 at * 1 (S.D.Ind. March 20, 2008), *citing Scott v. Harris*, 550 U.S. 372, 379 (2007).

5

which goes to the second level. The camera view shows a few cell doors on the second level and a portion of the railing, but the area at the top of the stairs in is not visible.

The recording shows Defendant Meehan and Tobeck sitting at the officers' desk. Defendant Tobeck says she opened the top tier cell doors to allow top tier inmates' two hours of dayroom activity. However, the Defendants admit inmate K.M. was not back in his cell and Defendant "Tobeck inadvertently opened the top tier cell doors while inmate (K.M.) was located in the shower area."(Def. Mot., p. 6, Un. Fact # 27). Plaintiff maintains Inmate K.M. had been hiding in the shower area, but there is no evidence in the record to establish whether the inmate was hiding, or jail staff simply forgot he was out of his cell and in the shower area.

The security video shows top tier inmates beginning to come out of their cells and walk downstairs around 3:18:45. Less than one minute later, Plaintiff's cell mate walks by the officer's desk. (Def. Mot., Ex. J). Fifteen seconds later, at 3:19:40, Inmate K.M. walks from the direction of the shower toward the officers' desk while holding a towel. At this point, Defendant Tobeck says she realized Inmate K.M. was still out of his cell, and told him he needed to return to his cell to lock up. (Def. Mot., Plain. Depo., Ex. 6). The inmate responded "Okay, Tobeck," and began walking toward his cell. (Def. Mot. Plain. Depo. Ex. 6). During this time, Plaintiff was still in his cell on the upper tier.

Inmate K.M. walks towards his cell, but at 3:19:45, the inmate instead runs up the stairs toward Plaintiff's cell mate. The two move out of the camera's range at the top of the stairs and the remainder of the physical exchange between inmates is not visible. (Def. Mot., Ex. J). The parties agree Inmate K.M. grabbed Plaintiff's cell mate and began

6

swinging at him with a closed fist. (Def. Mot., Plain. Depo. p. 173-177, Ex. 6). Plaintiff says he ran to intervene within five to ten seconds. (Def. Mot, Plain. Depo., p. 75-76). Plaintiff did not believe his cell mate could defend himself and he saw Inmate K.M. "hunched over," grabbing his cell mate's legs. (Def. Mot, Plain. Depo., p. 75-76). Therefore, Plaintiff thought Inmate K.M. might try to hoist his cell mate over the railing. (Def. Mot., p. 78-79, 99-100).

Neither of the officers describes Inmate K.M. as taking any action to push Plaintiff's cell mate over the railing. Instead, Defendant Tobek and Meehan both agree Plaintiff quickly intervened to try and stop Inmate K.M. from punching his cell mate, and Tobek says Inmate K.M. had Plaintiff's cell mate in "a head lock." (Def. Mot., Plain. Depo., Ex. 6).

At approximately 3:20 on the security video, Defendant Meehan is observed giving verbal orders although there is no audio recording. Defendant Tobeck is at the officer's desk. Defendant Tobek says she immediately called "10/10" over the radio for back up. (Def. Mot., Plain. Depo., Ex. 6). Both officers also yelled verbal commands for the inmates to stop fighting and Defendant Meehan begins herding the five inmates on the day room floor to the side farthest from the staircase. (Def. Mot., Plain. Depo. Ex. 6; Tob. Int. #11).

At 3:20:38, Defendant Mayo entered E-POD and immediately ran up the stairs followed by Defendant Meehan and Officer Wilking. Plaintiff admits Defendant Mayo was not in the POD when the altercation began. (Def. Mot, Plain. Depo, p. 153, 161). The parties agree officers continued to yell commands for the inmates to stop fighting

7

and lay on the ground. Plaintiff also admits officers quickly intervened when those commands were ignored. (Def. Mot., Plain. Depo. p. 73-75).

Plaintiff says Defendant Mayo began grabbing him and not Inmate K.M. (Def. Mot., Plain. Depo. p.107-108). Defendant Mayo says officers were trying to separate the inmates. (Def. Mot., Mayo. Int. 6) Plaintiff admits he was not able to see what Defendant Meehan was doing and it's possible other officers were also trying to pull Inmate K.M. away. (Def. Mot., Plain. Depo. 88-89).

Plaintiff's cell mate did comply with commands to lie down. He was handcuffed and brought down the stairs by an officer, which is visible on the security video at 3:21:42. The Defendants admit Plaintiff also appeared to try and comply with their commands, but Inmate K.M. continued to assault him and Plaintiff responded. (Def. Mot., Plain. Depo., Ex. 6).

Between 3:22 and 3:22:30 on the security video, several additional officers enter the E POD and immediately ran up the stairs. Plaintiff admits at least eight officers were eventually at the top of the stairs. (Def. Mot., Plain. Depo. p. 110-114). Throughout the exchange, officers continued to yell for the inmates to stop or lie down or cuff up. (Def. Mot., Plain. Depo. p. 113-114). Defendant Tobeck says she could see several officers surrounding and trying to restrain Inmate K.M., including Defendant Meehan and Corporal Brown, while Defendant Mayo tried to restrain the Plaintiff. (Def. Mot., Plain. Depo., Ex. 6; Tob. Int. #24).

At some point, both inmates and some of the officers including Defendant Mayo ended up on the ground. (Def. Mot., Plain. Depo. p. 116-117). The officers again say it

8

appeared the Plaintiff was trying to comply with their commands to stop, but Inmate K.M. bit Plaintiff on the forearm. (Def. Mot., Plain. Depo., Ex. 6). Corporal Brown then hit Inmate K.M. with a taser and Inmate K.M. released Plaintiff and stopped fighting. Corporal Brown was the only individual with a taser at the time. (Def. Mot., Plain. Depo., Ex. 6).

Defendants have also supplied a copy of a brief taser video which shows the two inmates on the ground, handcuffed and surrounded by officers. (Def. Mot., Ex. K). The security video shows officers leading Inmate K. M. down the stairs at approximately 3:24, followed by the Plaintiff at approximately 3:25. The entire incident lasted about four minutes.

Plaintiff says he was transported to the hospital due to the lacerations on his arm and he has permanent scars from the bite marks. (Def. Mot., Plain. Depo. p. 169-172). Plaintiff also mentions nerve damage in his deposition, but he admits no medical professional has ever made this diagnosis. (Def. Mot., Plain. Depo. p. 170).

III. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence

9

in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a §1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

IV. ANAYLSIS

Defendants argue Plaintiff cannot demonstrate a constitutional violation. Correctional officials are required to "take reasonable measures to guarantee the safety of the inmates." *Farmer v Brennan*, 511 U.S. 825, 832 (1994). However, not every injury suffered within a jail or prison is a constitutional violation. *See Washington v LaPorte County Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002). To prove a failure to protect claim, a plaintiff must establish: (1) he faced a substantial risk of serious injury, and (2) the defendant acted with deliberate indifference to that risk. *Farmer,* 511 U.S. at 834; *Brown v Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

In response to the dispositive motion, Plaintiff says the Defendants violated his constitutional rights when they: 1) moved a "violent, mentally ill inmate" to a less restrictive unit with general population inmates; 2) performed an inadequate head count which did not conform with the written policy; 3) opened the upper tier cells

without insuring Inmate K.M. was in his cell; and 4) failed to protect Plaintiff from the assault once it began. (Plain. Resp.. p. 1, 2).

Several of Plaintiff's claims are without merit. For instance, Plaintiff cannot demonstrate Defendants failed to protect him when they moved Inmate K.M. to E-POD. The inmate was housed on a separate floor, in a single-man, segregated cell. Furthermore, the housing requirement, whether followed or not, called for Inmate K.M. to be kept separate from other inmates. More important, Plaintiff has not presented any evidence that any named Defendant was responsible for moving Inmate K.M. into the POD beyond his own hunch. *See Rockwell Automation, Inc. v. National Union Fire Insurance Co. of Pittsburgh*, *PA*, 544 F.3d 752, 757 (7th Cir. 2008)("mere speculation or conjecture will not defeat a summary judgment motion"); *Wells v. Bureau County*, 723 F.Supp.2d 1061, 1087 (C.D.Ill.,2010)("[a]t summary judgment, a plaintiff cannot rest on conclusory allegations but rather must come forward with specific citations to evidence in the record supporting his claims."); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007)("the nonmoving party must identify with reasonable particularity the evidence upon which the party relies.")

In addition, Plaintiff cannot demonstrate Defendants violated his constitutional rights by failing to protect him once the fight began. Courts have long held a "prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put [him] in significant jeopardy." *Guzman v. Sheahan,* 495 F.3d 852, 858 (7th Cir. 2007); *see also Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011)(no deliberate indifference

11

when officer "did not open the door to the day room to command the other detainees to stop the attack, but she took other steps to intervene by promptly calling for back-up and monitoring the fight from the secure area until other officers arrived."); *Bell v. Reusch*, 326 Fed.Appx. 391, 393 (7th Cir. 2009)("[g]uards are not required to put themselves at risk to break up fight between inmates and may wait for backup before intervening."); *Eddmonds v. Walker*, 317 Fed.Appx. 556, 558 (7th Cir. 2009)("[w]e have held that an immediate intervention in an inmate-on-inmate assault is not necessary."); *Miller v. Zaruba*, 2013 WL 5587288, at *6 (N.D.Ill., 2013)(lone officer in gym when two inmates began physical fight followed proper procedures by calling for back up which arrived within two minutes, and not physically intervening in fight before officers arrived); *Wimberly v. Dart*, 2010 WL 4719696, at *5 (N.D.Ill. Nov. 10, 2010)("even if Defendants were present and did see that Plaintiff was being attacked, it is not necessary for correctional officers to immediately or unreasonably intervene in an inmate-on-inmate assault."); *Hughes v. Ash*, 2013 WL 660501, at *5 (S.D.Ind. Feb. 22, 2013)("[t]he Seventh Circuit and other courts have held that officers are not required to risk injury to themselves to break up a fight between inmates).

      The evidence before the Court demonstrates JCDC officers were instructed not to physically intervene in a fight when they are outnumbered by inmates. When the incident on October 8, 2014 initially started, there were two officers in the POD and two inmates involved. However, Plaintiff admits he quickly joined the altercation. In addition, there were five other inmates out of their cells and in the dayroom area. Therefore, a minimum of eight inmates were out of their cells at the time.

12

The Defendants immediately called for back-up and the first officers arrived in less than a minute. A second group of back-up officers arrived within two minutes. In all, it took approximately four minutes, eight officers and a taser to stop the altercation.

The Court notes Plaintiff at times alleges Defendant Mayo was pulling on him and attempting to handcuff him, but Plaintiff also alleges he was already handcuffed when Inmate K.M. bit him. (Def. Mot., Plain. Depo. p. 82-83, 87-88, 165-166). Officer Mayo maintains he was not able to handcuff the Plaintiff until after the taser was deployed and the altercation was over. (Def. Memo, Plain. Depo., Ex. 6). Either way, the evidence demonstrates as Defendant Mayo was attempting to restrain Plaintiff, several other officers were also attempting to pull Inmate K.M. away from the Plaintiff. All of the officers were actively involved in attempting to stop the fight.

In addition, the failure to follow the written head count procedures alone is not a constitutional violation. *See Scott v. Edinburg,* 346 F.3d 752, 760 (7th Cir.2003)(explaining that §1983 provides a remedy for constitutional violations, not violations of state statutes and regulations); *Grissette v. Ramsey*, 81 Fed.Appx. 67, 68 (7th Cir. 2003)("even if the failure… violated jail regulations, that does not amount to a constitutional violation."). Defendant Assistant Chief Shultz confirms it was the common practice at JCDC to count inmates who were both in their cells and also out of the POD for things such as doctor or attorney visits. In addition, Defendant Schultz says since Inmate K.M. was only allowed one hour out of his cell and he was to be kept separate from other inmates, officers sometimes counted him as present when he was in the dayroom and all other inmates were in their cells.

What is more troubling is how Inmate K.M. was allowed to remain outside of his cell when Defendant Tobeck opened the upper tier cells. Nonetheless, Defendants maintain the Plaintiff cannot demonstrate Plaintiff was incarcerated under conditions posing a substantial risk of harm, nor that the Defendants acted with deliberate indifference to his health and safety. *See Farmer*, 511 U.s. at 834.

> As to the substantial risk element, also called the objective element, the plaintiff must show that he faced a risk of harm that was almost certain to materialize if nothing is done. In the context of detainee-on-detainee assault, risks attributable to ... highly probable attacks and particular detainees who pose a heightened risk of assault to the plaintiff satisfy this element. *Kozar v. Munoz*, 2017 WL 413605, at *3 (N.D.Ill. Jan. 31, 2017)(internal citations omitted).

As for deliberate indifference, the defendant must have "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago V. Walls,* 599 F.3d 749, 756 (7th Cir. 2010). "[M]ere negligence or even gross negligence does not constitute deliberate indifference." *Borello v. Allison,* 446 F.3d 742, 749 (7th Cir. 2006). However, "[t]he official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault," and "it does not matter whether the prisoner is at risk for reasons personal to him or because all the prisoners face the risk." *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001).

The Court first notes only Defendants Tobek and Meehan were in E-POD at the time of the assault. Plaintiff has failed to adequately explain how Defendants

Kolitwenzew, Mayo or Schultz were individually liable for his claim. *See Miller v. Zaruba*, 2013 WL 5587288, at *5 (N.D.Ill. Oct. 10, 2013)(defendants dismissed when no evidence presented were in the area until after fight began, and alleged failure to protect had already occurred); *Martin v. Benson*, 2017 WL 119407, at *7 (S.D.Ind., 2017)(lieutenant's supervisor role is insufficient to establish liability when he was not in unit at time of fight and not involved in classifying the inmates); *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir.2008)("[v]ague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants."). Therefore, the Court must only consider Plaintiff's failure to protect claim as to Defendants Tobek and Meehan, and Plaintiff has presented little evidence concerning Meehan's involvement prior to the altercation.

On the other hand, Defendant Tobek was not only responsible for the head count, but also responsible for opening the upper tier cells when Inmate K.M. was out of his cell. Defendants Tobek admits she knew Inmate K.M. had a history of violent behavior and assaulting other inmates. This was the very reason Inmate K.M. was housed in a single-man, segregation cell and officers were not to allow him contact with other inmates.

The Seventh Circuit has found a failure to supervise "could give rise to an inference of conscious disregard of a significant risk of violence." *Junior v Anderson*, 724 F.3d 812, 815 (7th Cir. 2013). However, the *Junior* case is distinguishable from the case before the Court. The defendant ignored several warnings that inmates in the

15

maximum security tier of the jail were in potential danger, but she took no action.  For instance, the defendant knew two cells were not properly locked, and noted a security risk in the log, but did nothing.  She knew additional inmates were released, doubling the number of inmates allowed out of their cell at one time.  In addition, the lights in the corridor between cells were not on.  Finally, when Plaintiff was attacked and repeatedly stabbed by a group of inmates, the Defendant was not at her post and there was evidence she had been gone approximately 20 minutes. *Id* at 814.

In the case before the Court, while Tobek did not follow the written procedures for performing a head count, the evidence demonstrates she followed the common practice.  There is no explanation for why she opened the top tier cells without confirming Inmate K.M. was in his cell.  However, as soon as this oversight came to her attention, she ordered Inmate K.M. back to his cell.  It was a short walk from the point Officer Tobek observed the inmate to his cell.  The inmate indicated his compliance, but within seconds, he began his attack on Plaintiff's cell mate.  There is no evidence before the Court to indicate this incident was more than negligence, perhaps gross negligence, on the part of Defendant Tobek. *See Mitchell v Elrod,* 1986 WL 7696 (N.D. Ill. June 27, 1986) (guards failure to be at post during alleged sexual assault was an act of omission constituting negligence, but not a claim pursuant to §1983); *see also Goka v Bobbitt*, 862 F.2d 646, 651 (7th Cir. 1988)("When prison officials are unaware of the risk involved and violate a policy which may have prevented injury to an inmate, courts have generally found no constitutional violation."); *O'Brien v Indiana Dept. of Correction ex.rel. Turner,*

495 F.3d 505, 510 (7th Cir. 2007)("[e]xercising poor judgment…falls short of meeting the standard of consciously disregarding a known risk to (plaintiff's) safety.").

More important, the Plaintiff chose to put himself in harm's way when he left his cell and intervened in the altercation. The Central District of Illinois considered a similar situation in *Lemmons v Durant*, 2011 Wl 4633104 (C.D. Ill. Oct. 4, 2011). The plaintiff had a verbal disagreement with another inmate. Later in the day, the plaintiff walked across the day room and verbally confronted the inmate, but the inmate responded by hitting the Plaintiff and a fight began. *Id* at 3. Plaintiff stated he had never had any previous problems with the inmate, but he knew the inmate had assaulted other residents and staff. *Id*. The Court noted the plaintiff chose to come out of his room to confront the inmate, "when he clearly could have avoided the situation by staying in his room or contacting staff." Id. "[S]tarting a fight or voluntarily participating in one and then getting the worst of it does not create a failure to protect claim." *Id.*

Similar reasoning is found in the Seventh Circuit case of *Benner v McAdory*, 34 Fed.Appx. 483, 484 (7th Cir. 2002). In this case, an inmate chose to walk back to his cell after a medical appointment. During his walk, an inmate asked plaintiff to come to his cell and retrieve some legal work. The plaintiff had no prior problems with the inmate, but plaintiff knew the inmate had a history of assaulting others. When Plaintiff walked up, the inmate threw boiling liquid in his face causing severe burns.

The Seventh Circuit held the plaintiff may have demonstrated defendants were grossly negligence, but found plaintiff was "immediately responsible for the unfortunate incident "since he chose to roam the prison rather than wait for an

17

escorting officer and chose to approach the attacking inmate's cell. *Id* at 487. Therefore, the Defendants' "actions were not the proximate cause of the harm that befell (plaintiff), and thus they cannot be liable to him under §1983." *Id.*

Plaintiff claims he was only trying to assist his roommate who was under assault. Nonetheless, Plaintiff admits there were correctional staff in the POD who saw the fight. He also admits he heard officers yelling voice commands to Inmate K.M. and his cellmate. Plaintiff admits he was involved in the incident within possibly "five to ten seconds." (Def. Mot., Plain. Depo. p. 76). The facts further demonstrate back-up officers arrived within less than a minute after the assault began and tried to pull the three inmates apart. Nonetheless, Plaintiff says he chose to try and help his cell mate because the officers did not "immediately respond and physically intervene…" (Def. Mot., Plain. Depo. p. 69).

Plaintiff points to a 1989 Eighth Circuit case in which the court stated it would not find that "intervening in an assault to save the life of another inmate precludes the bringing of a constitutional claim for injuries suffered in the fight." *Poole v. Missouri Dept. of Corrections*, 883 F.2d 640, 645 (8th Cir. 1989). In *Poole*, approximately 300 inmates were in a housing unit with one guard on duty. When the plaintiff observed one inmate stabbing another inmate repeatedly, he ultimately intervened to save the inmate's life. The facts are far different in the case before this Court. Nonetheless, Plaintiff was not prevented from pursuing his claim. However, at this stage, the Plaintiff has not presented sufficient evidence to overcome Defendants' motion for summary judgment.

While Plaintiff's intentions may have been to assist another, he made an immediate decision to intervene in a jail fight without allowing the Defendants to do their jobs. His actions ultimately put himself and the officers in greater danger. The motion for summary judgment on Plaintiff's failure to protect claim is granted.

The Court must also grant summary judgment on Plaintiff's official capacity claim. The Court first notes Plaintiff has failed to demonstrate any practice of allowing pretrial detainees and convicted inmates to live in the same POD lead to a constitutional violation. Plaintiff has not established there was such a practice at JCDC. Furthermore, when Plaintiff originally filed his complaint, he identified himself only as a pretrial detainee, not a convicted felon awaiting trial on a new charge. Any policy calling for the separation of the two is clearly designed to protect pretrial detainees who have never been convicted of a crime from inmates with previous criminal convictions such as the Plaintiff.[2]

More important, Plaintiff must show the Defendant employees committed a constitutional violation and that a policy or custom was "the moving force" behind the violation. *Monell v Department of Social Services*, 436 U.S. 658, 695 (1978). Since Plaintiff has failed to establish an underlying constitutional violation, the Court must also grant summary judgment on his official capacity claim. *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003); *Boston v. Dart*, 2016 WL 5373083, at *8 (N.D.Ill. Sept. 26, 2016).

---

[2] Plaintiff admits in his deposition he has convicted of various crimes including armed robbery, attempted Murder and aggravated battery with a firearm. (Def. Mot., Plain. Depo. p. 14-15).

IT IS THEREFORE order:

1) The Defendants' motion for summary judgment is granted pursuant to Federal Rule of Civil Procedure 56. [32]. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs.

2) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *See also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

Entered this 3rd day of March, 2017.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE